UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFERY A. MULLINS,

                     Plaintiff,           Civil Action No. 19-13443

                                        Honorable Thomas L. Ludington

v.                                    Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                     Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 16)

Plaintiff Jeffery Mullins ("Mullins") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 12, 16), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Mullins was not disabled under the Act between his alleged onset date and his date last insured is not supported by substantial evidence. Thus, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 16)** be **DENIED**, Mullins' Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN**

**PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award

of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be

**REMANDED** for further proceedings consistent with this Report and Recommendation.

## II.    REPORT

### A.    Background

Mullins was 45 years old at the time of his alleged onset date of October 20, 2012,

and at 5'7" tall weighed approximately 185 pounds during the relevant time period.  (Tr.

41, 79, 261, 264).  He completed the ninth grade – attending special education classes –

but had no further education.  (Tr. 95, 265).  He has some experience working in

construction, but he eventually stopped working in his last job because his mental

disabilities prevented him from performing the required tasks.  (Tr. 41-42, 78, 80, 265-66,

290).  He now alleges disability primarily as a result of cognitive deficits, substance abuse

in remission, traumatic brain injuries, depression, and anxiety.  (Tr. 43, 101, 113, 119, 264).

After Mullins' application for DIB was denied at the initial level on September 8,

2016 (Tr. 141-44), he timely requested an administrative hearing, which began on March

22, 2018, before ALJ David Mason, Jr.  (Tr. 69-128).  Mullins, who was represented by

attorney Sarah Schairbaum, testified at this hearing, as did his wife, Kelly Mullins, and

vocational expert ("VE") Michele Robb.  (*Id.*).  A supplemental hearing was held on

August 9, 2018, at which time medical expert ("ME") Steven Golub, M.D. testified,[1] as

---

[1] Dr. Golub testified that Mullins has no severe physical impairments.  (Tr. 48).  However, he also
indicated that he could not testify as to Mullins' neuropsychological issues, as "head injuries
[were] outside [his] area of expertise[.]"  (Tr. 49).

did VE John Stokes.  (Tr. 37-68).  On September 14, 2018, the ALJ issued a written

decision finding that Mullins was not disabled under the Act between his alleged onset date

(October 20, 2012) and his date last insured (December 31, 2015).  (Tr. 15-30).  On

September 17, 2019, the Appeals Council denied review.  (Tr. 1-5).  Mullins timely filed

for judicial review of the final decision on November 21, 2019.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Mullins'

medical record, function and disability reports, and testimony as to his conditions and

resulting limitations.  Instead of summarizing that information here, the Court will make

references and provide citations to the transcript as necessary in its discussion of the

parties' arguments.

**B.     The ALJ's Application of the Disability Framework Analysis**

Under the Act, DIB are available only for those who have a "disability."  *See Colvin*

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a

disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.

3

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Mullins was not disabled under the Act during the relevant time period.  At Step One, the ALJ found that Mullins did not engage in substantial gainful activity between October 20, 2012 (the alleged onset date) and December 31, 2015 (the date last insured).  (Tr. 17).  At Step Two, the ALJ found that, during this period of time, he had the severe impairments of alcohol abuse, cocaine abuse, history of closed head injury major neurocognitive disorder, cannabis disorder, major depressive disorder, generalized anxiety disorder, borderline intellectual functioning, and mild degenerative disc disease of the lumbar spine.  (*Id.*).  At Step Three,

4

the ALJ found that, through the date last insured, Mullins' impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment. (Tr. 18).

The ALJ then assessed Mullins' residual functional capacity ("RFC"), concluding that, through the date last insured, he was capable of performing light work, with the following limitations: could occasionally climb ramps/stairs (with hand rail); no ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently handle, finger, and feel bilaterally; could perform simple, 1-2 step routine, repetitive tasks (less than constant), not requiring a specific production rate, in a work environment free of fast pace production requirements, involving only simple work-related decisions with few, if any, workplace changes; could have occasional contact with co-workers and supervisors and brief and superficial contact with the general public; would be off-task 8% of the workday; would need moderate noise level (light industrial to office setting); could not perform team or tandem tasks; and would need to be redirected once per day. (Tr. 20-21).

At Step Four, the ALJ found that, during the relevant time period, Mullins was not capable of performing any of his past relevant work. (Tr. 28). At Step Five, the ALJ determined, based in part on testimony provided by VE Stokes in response to hypothetical questions, that, during the relevant time period, Mullins was capable of performing the jobs of cleaner, housekeeping (439,000 jobs nationally) and paper sorter (78,000 jobs). (Tr. 29-30). As a result, the ALJ concluded that Mullins was not disabled under the Act between October 20, 2012, and December 31, 2015. (Tr. 30).

5

C.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written

decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### D.    Analysis

In his motion, Mullins primarily argues that the ALJ erred in weighing the opinions of his treating medical provider, Sarah Platte, M.D. (ECF No. 12, PageID.1765-68). For the reasons set forth below, the Court agrees and finds that remand is warranted.

### 1.    *The Relevant Medical Evidence*

To begin with, as set forth above, Mullins completed the ninth grade – taking special education classes – but dropped out of school in the tenth grade. His childhood was traumatic, as he suffered physical abuse at the hands of his father and sexual abuse at the hands of a neighbor. He also was sexually assaulted in prison. (Tr. 356).

Between October 2012 and June 2015, Mullins sustained four head injuries, each of which likely contributed to his already limited cognitive abilities. In October 2012, he was hit by a car while riding his bike, resulting in additional problems with memory, attention, and headaches. (Tr. 449). Immediately following this head injury, Mullins served ninety days in jail when he violated the conditions of his bond by using cocaine. (Tr. 1163). He reported to jail medical staff having experienced suicidal ideation just two weeks earlier; as a result, his doses of Zoloft and Trazodone were increased, and neuropsychological testing was recommended once he was released from jail. (Tr. 1164; *see also* Tr. 469

(presented to emergency room on October 7, 2012, with plan to commit suicide by walking in front of traffic after two-day crack cocaine binge), 740 (same)).  After his release from jail, Mullins completed a drug treatment program and was released in early February 2013. (Tr. 614-15).

On February 13, 2013, Mullins presented to Sarah Platte, M.D., his primary care physician with whom he would establish a lengthy treating relationship, for the first time. (Tr. 679-81).  According to Dr. Platte, Mullins:

> … suffered head trauma right before he was incarcerated in October.
> He denies any loss of consciousness but he was riding a bike and went
> forward over the handlebars and hit the front part of his head.  He was
> having frequent headaches, right after that time but because he was
> incarcerated really had no workup of it as he was minimizing the
> symptoms at that time   He continues to have some occasional
> tightening of his head and dizziness and blurry vision that has been
> getting slightly better over time but continues to cause some
> symptoms on a near daily basis.

(Tr. 679).  Dr. Platte ordered an MRI of the brain, which showed scattered nonspecific changes in the white matter but otherwise no abnormality.  (Tr. 685).  At a May 14, 2013 visit to Dr. Platte, she noted that Mullins had seen someone in neurology, who was evaluating him because of his persistent headaches, as well as associated memory and concentration issues.  (Tr. 671).  That provider recommended a workup, which apparently included possible neuropsychological testing.  (*Id.*).  Over the next few months, at medication reviews with psychiatrists at Washtenaw County Community Mental Health ("CMH"), Mullins continued to report problems with memory and attention, as well as headaches and increased depression.  (Tr. 437-48).

On November 8, 2013, Mullins suffered his second head injury and was taken to the

emergency room after getting into an accident while riding his bike late in the evening. (Tr. 842). He had drunk approximately 12 beers that night and was not wearing a helmet when he ran into a stopped vehicle, flew through the air, and hit his head, losing consciousness. (*Id.*). He sustained isolated rib fractures and a traumatic brain injury ("TBI") and was discharged the next day. (Tr. 843). When he followed up with Dr. Platte on November 12, 2013, she noted that he suffered from chronic memory loss – worse when he was using substances – and noted that he was at "high risk for sequelae of TBI, especially given substance abuse" and "[w]ould likely benefit from neuropsych[ological] testing." (Tr. 663-64).

Between January 12-14, 2014, Mullins was again admitted to the University of Michigan Hospital after he attempted suicide by drinking and taking nine Trazodone pills. (Tr. 818 (admitting he wanted "to 'fall asleep, and not wake up'")). He was treated and discharged to a halfway house. (Tr. 658). Then, on April 17, 2014, Mullins' third head injury occurred; he presented to the University of Michigan emergency room after he got into a fight with his nephew and was "body slammed" to the ground. (Tr. 788). Again, his head hit the ground and he lost consciousness and suffered multiple rib fractures. (*Id.*). At a follow-up visit to Dr. Platte in May 2014, she characterized his injury as a TBI, noted a worsening of previously reported symptoms, and mentioned Mullins' report that functioning was "very difficult." (Tr. 653). At a visit to CMH in January 2015, Mullins' wife reported concerns that his memory problems were getting worse, saying she wasn't sure if it was because he was anxious, because of the long term effects of his heavy drug and alcohol use, or early onset dementia. (Tr. 416).

On March 11, 2015, Mullins underwent a neuropsychology evaluation at the University of Michigan "to assess his cognitive and emotional functioning in the context of reported memory and attention difficulties." (Tr. 1190). Mullins' wife, Kelly, reported that his capabilities had declined over the past year and a half, with slowed processing, poor memory, and difficulty with orientation. (*Id.*). Mullins reported his extensive psychiatric history and substance abuse, incarcerations, and indicated that he had last smoked marijuana just one or two days prior. (Tr. 1191). Multiple tests were administered, but the examiner found:

> The patient's neuropsychological data was highly suggestive of poor effort and credibility and the results are deemed invalid; therefore, we are unable to document level of cognitive functioning at this time. His extremely low scores produced on testing are incongruent with his clinical presentation as he is an adequate personal historian, independently manages medications, and has no reported problems with cooking, chores, or driving.[2]

(Tr. 1192 (footnote added)).

On June 20, 2015, Mullins was brought to the University of Michigan emergency room ("quite intoxicated") when his mother called 911 after Mullins made homicidal threats toward his brother. (Tr. 895). On evaluation, Mullins described a desire to kill his brother due to "condescending comments" his brother apparently had made about his ability to care for their mother. (Tr. 895-96). On examination, his Global Assessment of Functioning ("GAF") score was 21-30 (representing a serious impairment), although he

---

[2] It is worth noting that in terms of independently managing his medications, Mullins was taking only one medication – Celexa. (Tr. 1190). Moreover, he only recently had his driver's license reinstated after it had been revoked for years (*Id.*), and he indicated in his function report that he drove only when necessary (Tr. 286).

later indicated he would not kill his brother.  (Tr. 901, 906; *see also* Tr. 461-63).

Just a few days later, on June 28, 2015, Mullins suffered his fourth head injury, presenting to the emergency room after drinking five beers and being thrown over the handlebars while riding his bike.  (Tr. 713).  Mullins was wearing a helmet[3] and struck his head on the ground, although he did not note any significant damage to the helmet.  Despite his head and neck pain, a CT scan showed no fracture.  (*Id.*; Tr. 715).  At a follow-up visit to Dr. Platte on July 22, 2015, she expressed concern that she still believed he had a TBI, indicating a desire to identify a rehabilitation specialist who could help with an evaluation.  (Tr. 637).  Just two days later, on July 24, 2015, Mullins again attempted suicide by walking into traffic while drunk.[4]  (Tr. 387, 907).  On August 26, 2015, Mullins saw Dr. Platte again, reporting functioning was "very difficult."  (Tr. 629).  On questioning, he reported a depressed mood, difficulty concentrating, difficulty falling asleep, diminished interest or pleasure, fatigue, and feelings of guilt and restlessness.  (*Id.*).  Dr. Platte noted that associated symptoms included headaches and restlessness and referenced prior "neuropsych testing which was inconclusive and did not show good effort."  (*Id.*).  Dr. Platte continued to believe that Mullins suffered from a TBI, saying:

> Does have underlying TBI, but his recent neuropsych testing was not
> revealing – it was interpreted as having poor effort.  This can certainly

---

[3] Contrary to this evidence of record, the ALJ incorrectly discounted Mullins' credibility (in part), asserting, "despite the claimants [sic] numerous bicycling accidents and physician recommendations that he follow preventative health activities, such as wearing a bike helmet[,] there is no evidence that the claimant followed this recommendation."  (Tr. 25).

[4] Mullins attempted suicide in the same fashion again on September 9, 2015.  (Tr. 370, 524, 707). Apparently, one of his brothers was killed in this manner.

be also affected by his substance use.[5]  There is certainly secondary gain related to these results as disability status could depend heavily on this.  Could benefit from further eval[uation].

(Tr. 630 (footnote added)).

On December 2, 2015, at the request of Dr. Platte, Mullins visited the Physical Medicine and Rehabilitation Clinic at the University of Michigan for evaluation of memory impairment by Nick Bomalaski, M.D.  (Tr. 1213-16).  Mrs. Mullins reported that her husband had difficulty learning ever since he was a young child, along with issues with depression, impulsivity, suicidality, and heavy drug and alcohol use.  (Tr. 1213).  He indicated that he was "once hit over the head with a stick at a party requiring some sutures over his scalp, but otherwise has no history of [traumatic] brain injury."[6]  (*Id.*).  He further reported that, over recent years, he had noticed increased difficulty remembering things such as sports scores or tasks that he had been assigned.  (*Id.*).  Dr. Bomalaski's impression was as follows:

> [Mullins has] a history of lifelong learning delay as well as heavy drug and alcohol abuse, presenting with impaired cognition.  On Mini-Mental status exam his primary deficits appear to be in memory and attention.  It is likely that he has always had some degree of impaired intellect that has been compounded by years of heavy alcohol and drug use.  We cannot rule out that there may be some form of early dementia developing, whether that be due to his substance use or an Alzheimer's like process.  He is not having any of the characteristic personality changes seen in frontotemporal dementia nor is he having the parkinsonism or visual hallucinations that might characterize a Lewy body dementia.  Ultimately neuropsychologic testing would be

---

[5]  Indeed, the ALJ acknowledged the possibility that Mullins' "poor effort" on the neuropsychological evaluation "could be affected by his substance use."  (Tr. 25).

[6]  As set forth above, contrary to this report, Mullins suffered at least four head injuries over a relatively short period of time, leading his primary care physician to conclude he suffered from a history of TBIs.

> the best avenue for identifying his deficits, however it appears that the
> recent evaluation he received earlier this year may have been invalid
> for reasons not clear to this examiner at the moment.

(Tr. 1215-16).  Mullins was referred to speech therapy for cognitive evaluation with the

thought that, if he had deficits, therapy could help him learn compensatory strategies for

his impaired memory.  (Tr. 1216).  Dr. Bomalaski also indicated he would look into why

Mullins' neuropsychological testing was invalidated – whether "due to lack of effort,

intentionally throwing the exam, or due to intoxication." (*Id.*).

On December 30, 2015, Mullins presented to the Adult Neurorehabilitation Program

at the University of Michigan for an initial speech-language evaluation with Jennifer

Santer, MA, CCC-SLP.  (Tr. 1194-98).  Again, Mullins denied any history of TBIs,

although Ms. Santer referred to his medical chart, which clearly showed the opposite. (Tr.

1194).  Upon testing, Ms. Santer's impressions included: slowed processing speed

affecting more complex auditory comprehension; impaired verbal fluency and

organization; intermittent impulsivity; and "anticipated diminished complex reasoning,

problem solving." (Tr. 1197).  She recommended that Mullins receive speech-language

pathology services to target cognitive-linguistic deficits and compensatory strategies. (*Id.*).

At a visit to Dr. Platte on February 3, 2016 – only about one month after Mullins'

date last insured – she noted he was having a hard time completing even entry-level job

applications.  (Tr. 1308).  At his next visit, in March 2016, Dr. Platte reiterated her belief

that Mullins needed repeat neuropsychological testing.  (Tr. 1302).  She further stated:

> He is currently working on a disability application.  At this point,
> based on my interactions with him, I agree that I think him working
> at a regular full-time job would be quite difficult and his skills are

> very limited. However, I also think it's reasonable to have conclusive neuropsych testing to support his case and recommend that he do this. Additionally, he cannot have appropriate testing while using any sort of substances, including marijuana or alcohol – he must stop these immediately and remain clean, otherwise it will be impossible to accurately assess his cognitive abilities.

(Tr. 1303).[7]

Subsequently, the record contains three medical opinions – two from Dr. Platte (in May 2016 and August 2018), and one from Mullins' CMH psychiatrist, Craig Washington, Jr., M.D. (in August 2017). Specifically, in May 2016, Dr. Platte opined that Mullins has "multiple medical issues" including major depressive disorder, as well as "issues with cognitive functioning and likely [] some cognitive impairment." (Tr. 1203). She referred to his "history of multiple episodes of head trauma" as well as his substance abuse issues, indicating that these factors "may have contributed to his current cognitive issues." (*Id.*). She concluded by saying: "In my opinion, he is not able to work, as he cannot keep track of simple tasks on his own and requires a lot of assistance from his family members for independent activities of daily living (ADLs)." (*Id.*).

On August 10, 2017, Dr. Washington, one of Mullins' treating psychiatrists at CMH, opined as follows:

---

[7] On March 9 and 16, 2018, Mullins underwent a second neuropsychological evaluation, this time with Thomas Rosenbaum, Ph.D. (Tr. 1531-42). This evaluation consisted of a battery of tests, the results of which were deemed valid. (Tr. 1538). Intellectually, Mullins performed in the borderline range in verbal comprehension, perceptual reasoning, working memory, processing speed, reading and math comprehension, and spelling. (*Id.*). Additionally, Dr. Rosenbaum noted that Mullins had difficulties with executive functioning tasks and both delayed and immediate memory were impaired. (*Id.*). In conclusion, he stated: "Mr. Mullins is no longer able to perform the physical work he has done in the past. While sedentary work may be possible, he does not have adequate academic, cognitive or memory ability to meet workforce demands. (*Id.*).

14

> Jeffery Mullins is currently under my care at Washtenaw Community Mental Health for treatment of generalized anxiety disorder and major depressive disorder.  His symptoms have improved somewhat since beginning treatment at this clinic but remain problematic and continue[] to contribute to significant cognitive difficulties.  These ongoing symptoms will likely negatively impact Mr. Mullins' ability to maintain consistent employment.

(Tr. 1485).

In support of his application for disability benefits, Mullins also submitted a narrative medical source statement from Dr. Platte, dated August 2, 2018.  (Tr. 1578-79).  In that statement, Dr. Platte explained that she had been treating Mullins since February 2013 and that at her initial visit with him, he was experiencing headaches, difficulty concentrating, and memory problems.  (Tr. 1578).  Dr. Platte noted that, even at that time, she observed difficulties with Mullins' executive functioning, and that had not changed over the years.  (*Id.*).  She explained that her notes supported her finding that Mullins had difficulty with forgetfulness and following through with tasks, and an overall limited functional status, and that these difficulties prevented him from maintaining regular work.  (*Id.*).  Dr. Platte further endorsed the findings from Dr. Rosenbaum's March 2018 neuropsychological evaluation, *supra* at footnote 7, as being consistent with the symptoms she noted over the years of her treatment of Mullins, which included cognitive impairment, intellectual dysfunction, and mood disorder.  (*Id.*).  She concluded by saying that Mullins' symptoms "have been persistent throughout this time that I have been caring for him and have caused significant functional impairment."  (*Id.*).[8]

---

[8] Although after his date last insured of January 30, 2015, medical records throughout 2016, 2017, and 2018 continue to reflect ongoing problems with anxiety, post-traumatic stress disorder, alcohol

2.    *The ALJ's Evaluation of the Medical Opinion Evidence*

In his motion for summary judgment, Mullins argues that the ALJ violated the treating physician rule when he gave no weight to Dr. Platte's 2016 opinion and ignored completely Dr. Platte's 2018 medical source statement.[9]  (ECF No. 12, PageID.1765-70). For the reasons set forth below, the Court finds merit to Mullins' arguments.

The treating physician rule, which applied to Mullins' claim given that he filed it on February 23, 2016, "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)).   "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given

---

use, limited concentration, paranoia, disorganized thoughts, sleep disturbances, mood swings, and increases in psychiatric medication.  (*E.g.*, Tr. 970-75, 1028-40, 1346-61, 1449-51).

[9] Mullins also argues that the ALJ erred in evaluating Dr. Rosenbaum's opinion and his subjective complaints.  (ECF No. 12, PageID.1768-72).  Because the Court is recommending remand on other grounds, it need not discuss in detail the merits of these arguments.  On remand, however, the ALJ should carefully consider both of these issues.

to a] treating source's opinion.'"  *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  It is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that []he is not.'"  *Id.* at 937-38 (quoting *Wilson*, 378 F.3d at 544).  Thus, district courts should not hesitate to remand when the Commissioner has failed to identify the weight assigned to a treating physician's opinion and provide good reasons for that weight.  *See Schultz v. Comm'r of Soc. Sec.*, No. 15-12473, 2016 WL 457709, at *5 (E.D. Mich. Aug. 10, 2016) (citing *Cole*, 661 F.3d at 939).  The Court finds that the ALJ failed to adhere to these standards in his handling of Dr. Platte's opinions, and that those errors were not harmless.

### Dr. Platte's May 2016 Opinion

As set forth above, Dr. Platte opined in May 2016 – just a few months after Mullins' date last insured – that he had "multiple medical issues" including major depressive disorder, as well as "issues with cognitive functioning and likely [] some cognitive impairment." (Tr. 1203).  She referred to his "history of multiple episodes of head trauma" as well as his substance abuse issues, indicating that these factors "may have contributed to his current cognitive issues." (*Id.*).  She concluded by saying: "In my opinion, he is not able to work, as *he cannot keep track of simple tasks on his own* and *requires a lot of assistance from his family members for independent activities of daily living* (ADLs)." (*Id.*) (emphasis added).  In discussing Dr. Platte's opinion, the ALJ noted Dr. Platte's findings

17

that Mullins (1) was unable to keep track of simple tasks on his own, and (2) requires "a lot" of assistance from family to meet his ADLs. (Tr. 26). However, the ALJ then wrote only: "No weight is afforded to Dr. Sara Platte's opinion because the determination of whether a claimant is unable to work is reserved for the Commissioner of the Social Security Administration." (Tr. 26).

As an initial matter, the ALJ appropriately discounted Dr. Platte's opinion that Mullins was "not able to work" because this is a legal conclusion specifically reserved for the Commissioner. *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 474 (6th Cir. 2008) ("[a] physician's opinion that a claimant is disabled is entitled to no deference because it is the prerogative of the Commissioner, not the treating physician, to make a disability determination."). As the Commissioner concedes, however, the ALJ erred by failing to address the other aspects of Dr. Platte's 2016 opinion, including her opinion that Mullins "cannot keep track of simple tasks on his own." (ECF No. 16, PageID.1794-95). The Commissioner argues that such an error is harmless, and does not warrant remand, because the ALJ "ultimately agreed with Dr. Platte's 2016 opinion that [Mullins] had difficulty with simple tasks" and "adequately accommodated that difficulty by finding [Mullins] was limited to a highly restricted subset of simple duties in low stress jobs[.]" (*Id.* (citing Tr. 20-21)).

The Court disagrees that the ALJ's error is harmless. Dr. Platte specifically found that Mullins "*cannot keep track of simple tasks on his own*," whereas the ALJ's RFC finding states that he *can perform a range of simple tasks* and *would need to be redirected only once per day*. (Tr. 20-21). These two findings appear incongruous and highlight the

18

ALJ's error in weighing this treating physician opinion.

*Dr. Platte's August 2018 Opinion*

Turning to Dr. Platte's August 2018 narrative statement, Mullins argues that the ALJ "completely ignored" this statement "and gave no explanation as to why this report was not given any weight." (ECF No. 12, PageID.1767). In that statement, Dr. Platte explained that she had been Mullins' treating physician since February 2013 and that, even at her initial visit with him, he was experiencing headaches, difficulty concentrating, and memory problems, and she observed difficulties with his executive functioning that had not changed over time. (Tr. 1578). She explained that her notes supported her findings that Mullins had difficulty with forgetfulness and following through with tasks, and an overall limited functional status, and that these difficulties prevented him from "maintaining regular work." (*Id.*). She further stated that Mullins has been "unable to effectively live on his own, even during periods of separation from his wife, due to inability to consistently manage even daily tasks by himself." (*Id.*).

The Commissioner concedes that the ALJ failed to address Dr. Platte's 2018 statements – specifically, her opinions that he had "difficulty concentrating," "memory difficulty," "difficulty following through on tasks," and other "functional impairment." (ECF No. 16, PageID.1791-92). He argues that such error is harmless for several reasons, none of which are persuasive.

First, the Commissioner argues that an ALJ is only required to evaluate a "medical opinion," which is defined as what a claimant "can still do despite [his] impairment(s)." (*Id.* (citing 20 C.F.R. § 404.1527(a)(1), (c)). According to the Commissioner, Dr. Platte's

2018 statement is not a "medical opinion" because she did not state what Mullins can still do despite his impairments; rather, she simply said that Mullins "had unspecified difficulties and impairments[.]" (*Id.*). The Court disagrees. Dr. Platte's statement meets the definition of "medical opinion" under the regulations – *i.e.*, it is a statement from an acceptable medical source that reflects judgments about the nature and severity of Mullins' impairments. *See* 20 C.F.R. § 404.1527(a)(1). The statement at issue sets forth the length of treatment, her familiarity with Mullins, and a summary of her treatment notes, dating back to her first visits with him. (Tr. 1678). She goes on to state that he consistently displayed "*memory difficulty*," had difficulty maintaining work due to "*forgetfulness and difficulty following through on tasks*," and was "*unable* to effectively live on his own … due to the *inability* to consistently manage daily tasks by himself." (*Id.*) (emphasis added). Thus, while perhaps not stated in the most typical form, Dr. Platte's 2018 statement expressly sets forth his significant limitations that the ALJ was required to consider under the applicable regulations: memory deficits, difficulties with follow-through, and limitations with managing daily tasks. *See, e.g., Sarp v. Comm'r of Soc. Sec.*, No. 16-10099, 2017 WL 1365414, at *3 (E.D. Mich. Apr. 14, 2017) (statement describing plaintiff's symptoms, diagnoses, and assignment of GAF score is a "medical opinion," even though physician did not opine on plaintiff's "capabilities despite his impairments").

The Commissioner next argues that even if Dr. Platte's 2018 statement is a "medical opinion," the ALJ's "erroneous failure" to address it is harmless because nothing in the opinion "establishes any specific functional limitations beyond what the ALJ assessed." (ECF No. 16, PageID.1793). The Court disagrees that the error is harmless. It is true that

20

the ALJ's RFC assessment included the limitation of being off task 8% of the day and that Mullins would need to be redirected once per day; however, in light of the issues identified above, it is unclear whether the ALJ's assessment reflects reasoned consideration of Dr. Mullins' opinions.  Moreover, where the ALJ failed to discuss Dr. Platte's 2018 opinion at all, meaningful review by the Court is difficult – if not impossible; the Court simply cannot determine (nor is it appropriate for it to attempt to determine) whether this opinion would have swayed the ALJ to impose further restrictions, such as needing to be redirected multiple times throughout a workday or being off task a few more minutes per hour.  *See Schultz*, 2016 WL 457709, at *6.  And, where the VE testified that even such slight modifications to Mullins' restrictions – such as needing to be redirected multiple times a day or being off task 10% of the day – would be work-preclusive (Tr. 124-25), the Court cannot say that the ALJ's error in failing to weigh Dr. Platte's 2018 opinion is harmless.  Remand is appropriate so that the ALJ can make a thorough and proper evaluation regarding this potentially determinative issue in the first instance.[10]  *See, e.g., Mendyk v. Comm'r of Soc. Sec. Admin.*, No. 18-11730, 2019 WL 4053949, at *7 (E.D. Mich. Aug. 7, 2019) ("Fundamentally, it is the responsibility of the ALJ, not the Court nor the Commissioner, to evaluate the relevant evidence in the first instance . . .").

In short, the foregoing makes clear that the ALJ's decision to reject and/or ignore

---

[10] As even Mullins admits, "[t]he fact is we don't know whether this additional evidence might have pushed the limitation to a greater percentage of off task behavior or the need for redirection more than once per day."  (ECF No. 18, PageID.1817).  *Cf. Reid v. Comm'r of Soc. Sec.*, 474 F. Supp. 3d 911, 922 (E.D. Mich. 2020) ("An award of benefits is appropriate 'only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'") (quoting *Faucher v. HHS*, 17 F.3d 171, 176 (6th Cir. 1994)).

the opinions of Dr. Platte is simply not supported by substantial evidence, and is not the product of an even and thorough weighing of the competing evidence in the record. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).  As such, remand is warranted.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 16)** be **DENIED**, Mullins' Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

Dated: January 25, 2021                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2);

E.D. Mich. L.R. 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 25, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager